**ORAL ARGUMENT NOT YET SCHEDULED**
**No. 23-5076**

IN THE

# United States Court of Appeals

FOR THE DISTRICT OF COLUMBIA CIRCUIT

SAULT ST. MARIE TRIBE OF CHIPPEWA INDIANS,
*Plaintiff-Appellant,*

v.

DEBRA A. HAALAND, in her official capacity as Secretary of the Interior, and
UNITED STATES DEPARTMENT OF THE INTERIOR,
*Defendant-Appellees,*

SAGINAW CHIPPEWA INDIAN TRIBE OF MICHIGAN; NOTTAWASEPPI HURON BAND
OF THE POTAWATOMI INDIANS; MGM GRAND DETROIT, L.L.C., DETROIT
ENTERTAINMENT, L.L.C., and GREEKTOWN CASINO, L.L.C.
*Intervenor-Appellees,*

On Appeal from the United States District Court for
the District of Columbia, No. 1:18-cv-2035-TNM
(Hon. Trevor N. McFadden)

## BRIEF OF INTERVENOR-APPELLEES MGM GRAND DETROIT, L.L.C., DETROIT ENTERTAINMENT, L.L.C., AND GREEKTOWN CASINO, L.L.C.

Ian Heath Gershengorn
    *Counsel of Record*
Mary E. Marshall
JENNER & BLOCK LLP
1099 New York Avenue, NW
Suite 900
Washington, DC 20001
Tel: (202) 639-6000
Fax: (202) 639-6066
igershengorn@jenner.com

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

**I.    Parties, Intervenors, and Amici**

The following is a list of parties before the District Court:

*Plaintiff*

- Sault Ste. Marie Tribe of Chippewa Indians

*Defendants*

- Debra A. Haaland, Secretary, United States Department of the Interior

- United States Department of the Interior

*Intervenor-Defendants*

- MGM Grand Detroit, L.L.C.

- Detroit Entertainment, L.L.C.

- Greektown Casino, L.L.C.

- Saginaw Chippewa Indian Tribe of Michigan

- Nottawaseppi Huron Band of Potawatomi Indians

No amicus appeared before the District Court, and no amicus has appeared before this Court.

**II.    Rulings Under Review**

The following ruling of the United States District Court for the District of Columbia (McFadden, J.) is at issue in this matter:

i

- Memorandum Opinion and Order of March 6, 2023, granting Defendants' and Defendant-Intervenors' Motion to Dismiss. *See Sault Ste. Marie Tribe of Chippewa Indians v. Haaland*, No. 18-cv-2035 (TJK) (D.D.C.) Dkts. 106 & 107.

## III.   Related Cases

The case now pending before this Court was previously before this Court in *Sault Ste. Marie Tribe of Chippewa Indians v. Haaland*, No. 20-5123, which was consolidated with Nos. 20-5125, 20-5127, and 20-5128. Casino Intervenor-Appellees are not aware of any other related case pending before this Court or any other court within the meaning of D.C. Circuit Rule 28(a)(1)(C).

Respectfully submitted,

/s/ Ian Heath Gershengorn
Ian Heath Gershengorn
*Counsel of Record*
Mary E. Marshall
JENNER & BLOCK LLP
1099 New York Ave., NW, Suite 900
Washington, DC 20001
Telephone: (202) 639-6000
igershengorn@jenner.com

*Counsel for Intervenor-Appellees*
*MGM Grand Detroit, L.L.C.,*
*Detroit Entertainment, L.L.C.,*
*and Greektown Casino, L.L.C.*

January 10, 2024

# TABLE OF CONTENTS

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES ..............i

TABLE OF AUTHORITIES ..................................................................iv

INTRODUCTION ............................................................................1

SUMMARY OF ARGUMENT ...........................................................3

ARGUMENT ...................................................................................6

I.    Basic Principles of Statutory Interpretation Foreclose the Sault's Argument. ................................................................................6

      A.    The Sault's Proposed Reading of MILCSA Is at Odds with the Plain Text of the Statute. ........................................................6

      B.    The Sault's Reading of MILCSA Is At Odds with Federal Laws Governing Indian Gaming. ........................................20

      C.    The Indian Canon Has No Impact on This Court's Interpretation of MILCSA.................................................23

II.   Interior's Interpretation Warrants Deference. ...............................24

CONCLUSION ..............................................................................27

# TABLE OF AUTHORITIES[*]

*Akiachak Native Community v. United States Department of Interior*,
584 F. Supp. 2d 1 (D.D.C. 2008) .......................................................... 12

*Alabama v. PCI Gaming Authority*, 801 F.3d 1278 (11th Cir. 2015) .................... 21

*Bartenwerfer v. Buckley*, 598 U.S. 69 (2023) ............................................. 13

*California Valley Miwok Tribe v. United States*, 515 F.3d 1262 (D.C.
Cir. 2008) ........................................................................................ 25, 26

*California v. FERC*, 495 U.S. 490 (1990) ................................................. 23

*Chevron U.S.A., Inc. v. NRDC, Inc.*, 467 U.S. 837 (1984) ............................ 25

*City of Roseville v. Norton*, 348 F.3d 1020 (D.C. Cir. 2003) ........................ 24

*Club One Casino, Inc. v. Bernhardt*, 959 F.3d 1142 (9th Cir. 2020) ............... 12

*Cobell v. Salazar*, 573 F.3d 808 (D.C. Cir. 2009) ..................................... 25, 26

*Confederated Tribes of Grand Ronde Community of Oregon v. Jewell*,
830 F.3d 552 (D.C. Cir. 2016) ............................................................. 25

*Corley v. United States*, 556 U.S. 303 (2009) ........................................... 11

*Hemi Group, LLC v. City of New York*, 559 U.S. 1 (2010) ........................... 16

*Jennings v. Rodriguez*, 583 U.S. 281 (2018) ............................................. 15

*Jinks v. Richland County*, 538 U.S. 456 (2003) ......................................... 10

*Loughrin v. United States*, 573 U.S. 351 (2014) ........................................ 16

*Mortensen v. United States*, 322 U.S. 369 (1944) ...................................... 16, 17

*Narragansett Indian Tribe v. National Indian Gaming Commission*,
158 F.3d 1335 (D.C. Cir. 1998) ............................................................ 23

---

[*] Authorities chiefly relied upon are marked with an asterisk.

iv

*National Federation of Independent Business v. Sebelius*, 567 U.S. 519 (2012) .................................................................................................19

*Niz-Chavez v. Garland*, 141 S. Ct. 1474 (2021) ...................................13, 14

*Penobscot Indian Nation v. Key Bank of Maine*, 112 F.3d 538 (1st Cir. 1997) .................................................................................................27

*Rancheria v. Jewell*, 776 F.3d 706 (9th Cir. 2015) ............................24, 27

*Ross v. Blake*, 578 U.S. 632 (2016) ..........................................................6

*Russello v. United States*, 464 U.S. 16 (1983) ........................................8

*Southern Ute Indian Tribe v. Sebelius*, 657 F.3d 1071 (10th Cir. 2011) .................27

*\*Sault Ste. Marie Tribe of Chippewa Indians v. Haaland*, 25 F.4th 12 (D.C. Cir. 2022) .....................................................1, 4, 6, 8, 11, 12, 25

*Shakopee Mdewakanton Sioux Community v. Hope*, 16 F.3d 261 (8th Cir. 1994) .................................................................................................26

*Truck Trailer Manufacturers Ass'n v. EPA*, 17 F.4th 1198 (D.C. Cir. 2021) .................................................................................................15

*TRW, Inc. v. Andrews*, 534 U.S. 19 (2001) .............................................10

*United States Department of Treasury v. Fabe*, 508 U.S. 491 (1993) .............17, 18

*United States v. Bailey*, 444 U.S. 394 (1980) .........................................18

*Whitman v. American Trucking Ass'ns*, 531 U.S. 457 (2001) ................................22

*Wisconsin Central Ltd. v. United States*, 138 S. Ct. 2067 (2018) ..........................13

**STATUTES**

18 U.S.C. § 1344(2) ...................................................................16

18 U.S.C. § 1964(c) ...................................................................16

25 U.S.C. § 2710(b)(2)(B) .............................................................20

25 U.S.C. § 2719(a) ................................................................5, 22

Michigan Indian Land Claims Settlement Act, Pub. L. No. 105–143, 111 Stat. 2652 (1997)................................................................................1

    MILCSA § 108(b)................................................................4, 7, 8, 10

    MILCSA § 108(b)(1)(A) ...............................................................7

    MILCSA § 108(b)(1)(B) ...............................................................7

    *MILCSA § 108(c)................................................................4, 19, 21

    MILCSA § 108(c)(2) ...................................................................19

    *MILCSA § 108(c)(4) ...................................... 1, 2, 5, 6, 7, 8, 10, 11, 13, 20

    *MILCSA § 108(c)(5) ..........................................................1, 7, 11

    MILCSA § 108(f) .........................................................................8

**LEGISLATIVE MATERIALS**

S. Rep. No. 100-446 (1988), *as reprinted in* 1988 U.S.C.C.A.N. 3071 .................21

**OTHER AUTHORITIES**

26 C.F.R. § 1.501(c)(4)-1(a)(2)(ii)...........................................................9

*American Heritage Dictionary* 685 (5th ed. 2011)....................................14

"For", *Merriam-Webster*, https://www.merriam-webster.com/dictionary/for (last visited Jan. 9, 2024)..................................................14

"For", *The Oxford English Dictionary* (2022), https://www.oed.com/view/Entry/72761?rskey=vKD4ly&result=2#eid.............................14

Jeff Goodman, *A Casino Finds Its Place in the Sun*, Wash. Post (June 13, 2003) ..........................................................................21

National Indian Gaming Commission, *Use of Net Gaming Revenues Bulletin (Updated)*, No. 2022-4 (June 23, 2023)...............................20

*Websters Third New International Dictionary* 886 (1993).......................14

## INTRODUCTION

The Michigan Indian Land Claims Settlement Act ("MILCSA"), Pub. L. No. 105–143, 111 Stat 2652 (1997), imposes an extraordinary duty on the Department of the Interior by compelling it to take in trust certain lands that the Sault Ste. Marie Tribe of Chippewa Indians (the "Tribe" or the "Sault") acquires. But MILCSA limits that duty to specific circumstances set forth in the text. Throughout this litigation, the Sault have sought to erase those limits so the Tribe can acquire land, compel Interior to take that land in trust, and permit the Tribe to operate a for-profit casino on that land anywhere in Michigan and, indeed, anywhere in the country.

When this case was last before this Court, the Tribe focused on MILCSA's Section 108(c)(5). The Tribe argued that the statutory provision allowing it to spend MILCSA Fund interest "for consolidation or enhancement of tribal lands," MILCSA § 108(c)(5), entitled the Tribe to trigger the mandatory trust duty for a parcel hundreds of miles away from its existing lands and use it for gaming. This Court correctly rejected that interpretation, limiting Interior's trust duty only to real property that has some connection to existing tribal lands. *Sault Ste. Marie Tribe of Chippewa Indians v. Haaland*, 25 F.4th 12, 23-24 (D.C. Cir. 2022).

Having lost on its primary argument, the Tribe now shifts its attention to Section 108(c)(4). The Sault concede that, to even arguably trigger Interior's mandatory duty, Section 108(c)(4) requires the Tribe to show it is using "investment

1

income of the Self-Sufficiency Fund" "for educational, social welfare, health, cultural, or charitable purposes which benefit the members" of the Tribe. And, says the Tribe, that happens whenever the Tribe seeks to use income from the Fund to buy land for a casino. As the Tribe would have it, because its planned for-profit casino could "generat[e] revenues," Appellant's Br. at 2, and because the Tribe has promised to dedicate some sliver of those potential proceeds to provide social services, the Tribe is using income of the Fund for "social welfare … purposes." MILCSA § 108(c)(4).

Both the District Court and the Interior Department correctly rejected this strained interpretation. A for-profit casino is not a "social welfare" purpose. When the Tribe acquires land to build a for-profit casino, the expenditure is for "economic development." And that remains true even if the Tribe insists that, eventually (if successful), it will use some of the money from that economic development for purposes that *actually* constitute "social welfare." MILCSA carefully distinguishes between expenditures for "educational, social welfare, health cultural or charitable purposes"—which are subject to the mandatory trust duty—and expenditures for "economic development beneficial to the tribe"—which are not. The Tribe's overly broad interpretation of "social welfare" purposes would completely eliminate this distinction.

Contrary to the Tribe's contention, Interior's rejection of the Tribe's approach

as too "attenuated" does not rewrite the statute; it merely accords the text its ordinary meaning. When a parent gives a child money to spend "for social welfare purposes," the parent would surely be surprised if the child bet the money on the outcome of the World Series, even if the child promised to donate 5% of any winnings to the United Way. Likewise, it would be contrary to ordinary usage to describe that 5% donation as money "of" the parent, rather than the money "of" the gambling proceeds. Directness is, in other words, part of MILCSA's ordinary meaning, not Interior's invention.

In short, as the District Court correctly recognized, the Tribe's position defies plain meaning, makes hash of the distinctions in the text, and, if accepted, would destroy the limits that Congress carefully imposed on Interior's mandatory duty to take land in trust for the Tribe. The decision below should be affirmed.[2]

## SUMMARY OF ARGUMENT

The Tribe contends that its purchase of land to operate a for-profit casino triggers the mandatory trust duty. The plain text of MILCSA forecloses that result. Expenditures to build and ultimately operate a for-profit casino are for "economic

---

[2] The Casino Intervenor-Appellees address only the Sault's statutory interpretation arguments and leave to the government responses to the Sault's alternative argument that Interior arbitrarily "[f]ailed [t]o [a]ddress [e]vidence" that the acquisition of the Sibley Parcel would satisfy Section 108(c)(4), even under Interior's interpretation of the statute. Appellant's Br. at 48.

3

development," not for "social welfare," and that is true even if the Tribe has promised to donate 5% of the casino profits to actual social welfare purposes.

To begin, Congress carefully limited the types of tribal expenditures that trigger the mandatory trust duty. Section 108(b) of MILCSA, which governs expenditures of Fund *principal* and *does not* trigger the mandatory trust duty, broadly permits the Sault to expend principal from the Fund for any expenditures "the board of directors determines" (among other things) are "reasonably related to ... economic development beneficial to the tribe" or are "otherwise financially beneficial to the tribe and its members." By contrast, Section 108(c), which governs expenditures of Fund *income* and *does* under certain circumstances trigger the mandatory trust duty, provides no such flexibility; instead, it limits the Tribe to "five specific uses for which Fund interest 'shall be distributed.'" *Sault Ste. Marie*, 25 F.4th at 18. Those uses include expenditures for "educational, social welfare, health, cultural, or charitable purposes," but pointedly do not include "economic development" purposes. Congress knew how to authorize expenditures for tribal economic development, and it did so in Section 108(b), but not in Section 108(c). The Court must respect that choice.

Moreover, the Sault's interpretation conflicts with the ordinary meaning of the statute. The Tribe asserts that money spent to purchase land on which it intends to build a for-profit casino is money spent "for" a social welfare purpose. But no

4

ordinary English speaker would understand this to be the case. The land the Sault want Interior to take in trust was purchased *for* a casino. That some of the profits *might* eventually be used for the social welfare of the Sault does not change that fact. Similarly, the Sault ask this Court to read the word "of" in a way that is totally out of step with its ordinary meaning. Section 108(c)(4) conveys a mandatory trust duty when *income* "of the Self-Sufficiency Fund" is used for a social welfare purpose. The income that the Sault propose to use for a social welfare purpose, by contrast, will be income *of the Tribe's for-profit casino*. As such, Section 108(c) and the mandatory trust duty do not apply to the purchase here.

The Sault's effort to use MILCSA to expand the geographical reach of its gaming is also out of step with the Indian Gaming Regulatory Act ("IGRA"). In IGRA, Congress provided comprehensive regulation of gaming on Indian lands and strictly limited the land on which tribes can build a casino. 25 U.S.C. § 2719(a). It is inconceivable that Congress would seek to revise IGRA and expand the reach of gaming for the Sault through an act that never mentions IGRA—or even gaming at all.

Next, the Sault maintain that the Indian canon requires this Court to rule in its favor. Not so. MILCSA is unambiguous, so the canon plays no role. Moreover, even if there were ambiguity, the Indian canon *still* could not overcome the better reading of the statute here, because the Indian canon has no role when a tribe seeks to

displace the historical police powers of the States and when there are strong tribal interests on both sides.

Finally, if more were needed, any remaining questions of ambiguity should be resolved in favor of Interior, because deference is due to Interior. As this Court previously found, Interior has an "obligation to ensure a lawful trusteeship" under MILCSA, and it must therefore "have the authority to verify that the land was legitimately acquired … for the limited uses detailed in Section 108(c)." *Sault Ste. Marie*, 25 F.4th at 18-19.

## ARGUMENT

### I.    Basic Principles of Statutory Interpretation Foreclose the Sault's Argument.

The Tribe contends that its purchase of land to operate a for-profit casino triggers the mandatory trust duty. The plain text of MILCSA and the statutory scheme governing Indian gaming foreclose that result.

### A.    The Sault's Proposed Reading of MILCSA Is at Odds with the Plain Text of the Statute.

"Statutory interpretation … begins with the text." *Ross v. Blake*, 578 U.S. 632, 638 (2016). The text of MILCSA does not support the Sault's desired result. Running a for-profit casino is for "economic development," not for "educational, social welfare, health, cultural, or charitable purposes." Section 108(c)(4) does not permit the Tribe to spend Fund income to acquire mandatory trust land for general

6

economic development—a for-profit casino—simply because the Sault claim that, if that development succeeds, some of the profit (if any) will be devoted to social services.

        1.     The fundamental distinction in MILCSA—the one at the heart of this case—is between expenditures that trigger the mandatory trust duty, and those that do not. Expenditures under Section 108(b)—involving expenditures of Fund *principal*—do not trigger the mandatory trust duty. There, Congress spoke broadly. Section 108(b) vests discretion in the Tribe's board of directors to use Fund principal for any expenditures the board "determines … are reasonably related to" either "economic development beneficial to the tribe" or "development of tribal resources," or are "otherwise financially beneficial to the tribe or its members." MILCSA § 108(b)(1)(A)-(B).

By contrast, in Section 108(c), which triggers the mandatory trust duty under certain circumstances, Congress spoke narrowly. Congress chose not to incorporate Section 108(b)'s deference to determinations by the Tribe's board of directors. More importantly, Section 108(c) limits use of Fund *income* to only five enumerated purposes, including (as relevant here) "for educational, social welfare, health, cultural, or charitable purposes which benefit the [Tribe's] members" and "for consolidation or enhancement of tribal lands." *Id.* § 108(c)(4), (5). Only lands acquired under Section 108(c), not Section 108(b), "shall be held in trust … for the

7

benefit of the tribe." *Id.* § 108(f).

As this Court recognized in the previous appeal of this case, "[t]he appropriate expenditures of Fund principal are delineated in terms that arguably leave substantial discretion" to the Tribe to determine its "particular use." *Sault Ste. Marie,* 25 F.4th at 18. "By contrast, the use of Fund interest … makes no mention of the [Tribe's] determinations but instead lists five specific uses for which Fund interest 'shall be distributed,' reinforcing that the Tribe may expend Fund interest exclusively for those uses." *Id*.

Against this backdrop, the Tribe's interpretation is implausible. Congress carefully distinguished between "economic development" purposes in Section 108(b) and "educational, social welfare, health, cultural, or charitable purposes" in Section 108(c)(4). Yet the Tribe's argument would treat the two the same. "Where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Russello v. United States*, 464 U.S. 16, 23 (1983) (quotation marks omitted).

The Sault suggest that economic development for the Tribe inevitably advances the social welfare of the Tribe. But the text of MILCSA shows why that argument is wrong. Congress carefully distinguished between "economic development beneficial to the tribe" and "social welfare … purposes which benefit

8

the members of the [Tribe]." Basic principles of statutory interpretation confirm this. As the District Court noted, the canon *noscitur a sociis* dictates that "words grouped in a list should be given related meanings." Memorandum Opinion at 11 (D.D.C. Mar. 6, 2022), ECF No. 106 ("Op.") (quotation marks omitted) (quoting Antonin Scalia & Brian A. Garner, Reading Law: The Interpretation of Legal Texts 195 (2012)). Congress chose to surround the term "social welfare" with other words to inform its meaning: "educational," "health," "cultural," and "charitable." *Id.* at 11. "None of these words suggest a for-profit venture"; nor do they suggest that "'social welfare' should be read to sweep in ... economic development." *Id.* at 11-13. For Congress, the two were not synonymous. *Cf.* 26 C.F.R. § 1.501(c)(4)-1(a)(2)(ii) (specifying that an organization is not "operated primarily for the promotion of social welfare" under the Internal Revenue Code if it simply "carr[ies] on a business with the general public in a manner similar to organizations which are operated for profit.").

MILCSA also makes clear why the Sault are wrong to proclaim that the "purposes" for which Fund interest may be spent are "expansive [and] flexible." Appellant's Br. at 30. The purposes set forth *in Section 108(b)* are expansive and flexible, requiring deference to the determination of the board of directors, extending to matters that the board determines are "reasonably related to" (among other things) "economic development," and even allowing expenditures that are simply

9

"otherwise financially beneficial to the tribe and its members." MILCSA § 108(b). These provisions show that where Congress wanted to provide the Sault with flexibility, it knew how to do so. Section 108(c)(4), in contrast, lacks those textual markers of pliability; it reflects not expansiveness and flexibility, but precision and constraint. The choice to forego flexibility in Section 108(c)(4) and to limit the Tribe to expenditures for specific purposes must be given effect. When Congress has enumerated five (and only five) permissible non-economic purposes for Fund income, courts should reject interpretations, like the Sault's here, that are "so attenuated as to undermine [Congress's] enumeration." *Jinks v. Richland Cnty.*, 538 U.S. 456, 464 (2003).

Similarly, the Sault's interpretation renders Congress's careful specification of particular purposes in Section 108(c) a nullity. Congress knew when it drafted MILCSA that any economic development the Sault pursued might well redound to the benefit of tribal members, yet Congress chose to limit the expenditures of Fund interest to a different, narrow set of purposes. Allowing the Sault to use that narrow set of social welfare purposes in Section 108(c)(4) to justify general economic development would render the distinction between Section 108(b) and Section 108(c) "void [and] insignificant." *TRW, Inc. v. Andrews*, 534 U.S. 19, 21 (2001). If the Sault's interpretation is correct, and general economic development is an acceptable expenditure of Fund interest because it theoretically may eventually

10

benefit tribal members, then the enumerated list of permitted uses in Section 108(c)—and Section 108(c)(4) in particular—serves no purpose. "A statute should be construed so that effect is given to all its provisions." *Corley v. United States*, 556 U.S. 303, 314 (2009) (quotation marks and bracket omitted).

Further undermining the Sault's argument, it is not clear that Section 108(c)(4) permits the purchase of land under any circumstances. Section 108(c) has a provision that governs the purchase of land with Fund interest: Section 108(c)(5). In writing Section 108(c)(5), Congress limited the Sault's ability to purchase land with Fund interest to only property that would "consolidate[e] and enhance[]" existing tribal lands. As this Court previously held, that provision can apply only to a specific subset of land purchases—not all acquisitions. *Sault Ste. Marie*, 25 F.4th 23. If Section 108(c)(4) is construed to allow the Sault to purchase *any* land for virtually *any* purpose that benefits the members of the Tribe, then Section 108(c)(5)—and its limitations on the purchase of land with Fund income—becomes superfluous.

Congress's decision to limit MILCSA's mandatory trust duty to certain lands acquired with Fund income but not Fund principal makes good sense. Under the Tribe's reading, MILCSA imposes a mandatory trust duty whenever the Tribe claims to have expended Fund interest for economic development. That duty "implicates an elaborate patchwork of statutory and regulatory provisions." *Sault Ste. Marie*, 25

11

F.4th at 18. Trust acquisitions have significant legal implications, rendering land inalienable, nontaxable, and immune from state and local regulation. *Club One Casino, Inc. v. Bernhardt*, 959 F.3d 1142, 1149 (9th Cir. 2020); *see Akiachak Native Cmty. v. U.S. Dep't of Interior*, 584 F. Supp. 2d 1, 6 (D.D.C. 2008). Congress sensibly chose to limit the Sault's ability to trigger application of this remarkable power unilaterally.

The Sault attempt to skirt the clear distinction between uses of Fund interest and Fund principal in two ways. First, the Tribe provides a supposed limiting principle: "Fund interest ... may be used for economic development projects, so long as the purpose of the project is to achieve a statutorily enumerated end." Appellant's Br. at 41. But this is no limitation at all. *Every* tribe has as one core "purpose" advancing the educational, social welfare, health, and cultural well-being of its members. The Sault themselves characterize tribes as "not-for-profit corporations that are interested only in maximizing dividends for [their members]." Appellant's Br. at 8 (quotation marks omitted). By the Sault's logic, any economic development the Tribe undertakes would fall under the ambit of Section 108(c)(4). This, again, impermissibly collapses the distinctions Congress carefully drew in MILCSA.

Second, the Sault contend that limiting the use of Fund interest to those purposes clearly enumerated in Section 108(c) is tantamount to saying that "Fund interest can never be used for anything related to 'economic development.'"

Appellant's Br. 22. This argument, too, misses the mark. To the extent Fund interest is used for an enumerated purpose, the Tribe's expenditures are not impermissible just because they might also be considered economic development. Building a hospital or a museum, for example, is perfectly fine. *See infra* at 14. What is impermissible, however, is for the Sault to spend Fund interest on general economic development with the promise that future profits, if earned, may eventually be used for a purpose enumerated in Section 108(c). This is what the Sault propose to do here.

2. In an effort to overcome the clear distinction between Section 108(b) and Section 108(c), the Sault accuse Interior and the District Court of inventing a "directness" requirement that is not in the statute. That, too, is wrong. Courts interpret statutes in accordance with "ordinary meaning," based on how "ordinary people understand" the statutory language. *Niz-Chavez v. Garland*, 141 S. Ct. 1474, 1484-85 (2021); *accord Wis. Cent. Ltd. v. United States*, 138 S. Ct. 2067, 2070-71 (2018). And here, even setting aside the clarity provided by Section 108(b), the ordinary meaning of Section 108(c)(4) supports Interior, not the Tribe.

No "ordinary English speaker," *Bartenwerfer v. Buckley*, 598 U.S. 69, 75 (2023), would look at the for-profit casino that might someday rise from the Sibley Parcel and say, "That casino is for social welfare" (or "education[]," or "health," or "cultur[e]," or "charit[y]"). MILCSA § 108(c)(4). The Tribe acquired the Sibley

13

Parcel for gaming and for profit-making—that is, economic development. A different label cannot alter that reality.

Let's turn first to the dictionary. *See Niz-Chavez*, 141 S. Ct. at 1484-85 ("dictionary definitions … often inform how ordinary people understand" statutes). The word "for" "indicate[s] purpose."[3] Merriam-Webster offers as an example "a grant *for* studying medicine."[4] If a father gives his daughter $200,000 "for studying medicine," he would expect her to use the Funds to pay for medical school (or maybe pre-med courses, or even MCAT preparation), not to gamble in Vegas. If the daughter used the funds to gamble, the father would be no less dismayed if she swore that she intended to dedicate 5% of any winnings to medical-school tuition. In just the same way, the Sault can spend Fund income on social welfare, but they cannot use Fund income to build a for-profit casino—not even if they promise to spend some of the profits (if any) on social welfare.

That ordinary usage also contradicts the Sault's claim that purchasing land for

---

[3] "For", *Merriam-Webster*, https://www.merriam-webster.com/dictionary/for (last visited Jan. 9, 2023); *see The American Heritage Dictionary* 685 (5th ed. 2011) (defining "for" as a word used to "indicate the object, aim, or purpose of an action or activity."); "For", *The Oxford English Dictionary* (2022), https://www.oed.com/view/Entry/72761?rskey=vKD4ly&result=2#eid (defining "for" as "with the object or purpose of"); *Websters Third New International Dictionary* 886 (1993) (defining "for" as "having as goal or object').

[4] "For", *Merriam-Webster.*

a for-profit casino is no different from "purchasing land for a health clinic," which supposedly "does not immediately or directly provide health benefits to tribal members" but does so "only through the subsequent operation of the clinic." Appellant's Br. at 32. An ordinary English speaker would readily say that building a health-care clinic is for a "health" purpose, just as building a school is for "educational" purposes. Buying land to build a for-profit casino is simply not the same.

At its core, the Sault's textual argument is that it is linguistically possible to interpret the word "for" in isolation to reach any "plan [or] objective." Appellant's Br. at 26. "For" is a flexible word, carrying many shades of meaning. *Jennings v. Rodriguez*, 583 U.S. 271, 301 (2018). Care is thus required to stick to the meaning that makes sense of the phrase in which this flexible term appears. *Truck Trailer Mfrs Ass'n v. EPA*, 17 F.4th 1198, 1205 (D.C. Cir. 2021) ("Because common words typically have more than one meaning, you must use the context in which a given word appears to determine its aptest, most likely sense." (quoting Antonin Scalia & Bryan A. Garner, *A Note on the Use of Dictionaries*, 16 GREEN BAG 2d 419, 423 (2013)). That is why we do not understand a father's grant of $200,000 "for studying medicine" to authorize a fundraising trip to the blackjack tables.

Indeed, throughout the law, courts interpret similar statutory phrases to impose similar directness requirements. Take, for example, the federal bank fraud

statute, which requires that the defendant acquire the bank property "by means of" a misrepresentation. 18 U.S.C. § 1344(2). In analyzing the reach of that statute, the Supreme Court has noted that "by means of" requires a connection that is "something more than oblique, indirect, and incidental." *Loughrin v. United States*, 573 U.S. 351, 363 (2014). "If … Jane traded in her car for money to take a bike trip cross-country, no one would say she 'crossed the Rockies by means of a car,' even though her sale of the car somehow figured in the trip she took. The relation between those things would be ... too tangential to make use of the phrase at all appropriate." *Id.* (internal quotation marks omitted).

Another example is found in the Racketeer Influenced Corrupt Organizations ("RICO") Act, which limits its civil remedy to victims harmed "by reason of" a RICO violation. 18 U.S.C. § 1964(c). The Supreme Court has interpreted that phrase to "require 'some direct relation between the injury asserted and the injurious conduct alleged'" and to exclude links that are "too remote," "purely contingent," "indirect," or "attenuated," *Hemi Group, LLC v. City of New York*, 559 U.S. 1, 9-10 (2010) (citation omitted). That is consistent with the background principle, articulated long ago by Justice Holmes, that the "general tendency of the law, in regard to damages at least, is not to go beyond the first step," *id.* at 10 (ultimately quoting *S. Pac. Co. v. Darnell–Taenzer Lumber Co.*, 245 U.S. 531, 533 (1918)).

The Supreme Court's decision in *Mortensen v. United States*, 322 U.S. 369

16

(1944), on which the Sault rely, Appellant's Br. at 29, also underscores why they are wrong. The Mann Act criminalizes transporting women across state lines "for the purpose of prostitution." 322 U.S. at 373-74. In *Mortensen*, a couple who operated a brothel in Nebraska brought two of the sex workers to Utah for a vacation—and after their return, the two women immediately resumed sex work, as the couple "anticipated." *Id.* at 374-75. That return trip could be understood, in some literal sense, as "for … prostitution." But the Supreme Court explained that such an interpretation would yield "boundless" liability and would not further Congress's core "purpose" of criminalizing interstate human trafficking. *Id.* at 376-77. The Court therefore looked to "the dominant motive" of the interstate trip as a whole and declared that, "[i]n ordinary speech," the trip was "for an innocent vacation purpose." *Id.* at 374-75. In just the same way, the Sault's acquisition of the Sibley Parcel is—in ordinary speech—for gaming and economic-development purposes.

The Tribe cites two other cases it claims adopt a broad interpretation of the word "for," but neither helps its position. The first is *U.S. Department of Treasury v. Fabe*, which addressed "whether a state statute governing the priority of claims against an insolvent insurer is a law enacted for the purpose of regulating the business of insurance." 508 U.S. 491, 498-99 (1993) (alterations adopted) (internal quotation marks omitted). The Court concluded that it did, but not because the Court read "for the purpose of" so expansively as to include any conceivable "direct[] or

17

indirect[]" intent, as the Sault maintain. Appellant's Br. at 29 (quotation marks omitted). Instead, the Court's decision turned on the fact that the state statute protected insurance policyholders, bringing it within the realm of insurance regulation. 508 U.S. at 494-95. The Sault act as if the Court in *Fabe* held that the relevant state law allowed direct regulation of any company that happened to devote a portion of its revenues to buying its employees insurance. But no court has accepted such reasoning. *Fabe* thus provides the Sault no help at all.

Nor does *United States v. Bailey*—the other case the Sault invoke. Appellant's Br. at 29-30. The statute at issue in *Bailey* did not even contain the word "purpose." 444 U.S. 394, 401 (1980). To the extent the meaning of "purpose" was discussed, it was in an analysis of which of the traditional criminal mens rea elements (knowledge, purpose, recklessness, negligence) best fits a statutory requirement that a criminal defendant act with "intent." *Id.* at 407-08. This has no bearing on how these words should be read in the context of a civil statute governing the relationship between an Indian tribe and the Department of the Interior.

The Sault's hypotheticals are equally unavailing. An aspiring actor's retention of an acting coach has a direct connection to furthering the actor's acting career. An LSAT prep course has a direct connection to gaining admittance to law school. In none of these examples does a person take money and start an unrelated private for-profit business, promising that funds may eventually be spent on their originally

18

intended purpose.

Reinforcing the directness requirement flowing from the word "for" is Congress's use of the word "of." MILCSA's land-in-trust obligation is limited to land purchased using "income *of* the Self-Sufficiency Fund." § 108(c) (emphasis added). Here, the Sault propose to spend Fund income on land, seek to build a for-profit casino, and then operate that casino and dedicate some sliver of the income *of the casino* to advance a social welfare purpose. As with "for," no ordinary English speaker would consider income generated from a casino that was built on land purchased with Fund income as income "of the Self-Sufficiency Fund."

If the Tribe's interpretation were correct, then Congress's choice to enumerate specific uses for Fund income would once again become meaningless. For example, MILCSA allows for Fund income to be spent "as a dividend to tribal members." § 108(c)(2). In the Tribe's view, the Tribe could thus spend Fund income to purchase land for any private enterprise—a casino, a factory, or a mining business—as long as it commits to giving the income from the business as a dividend to tribal members. "The enumeration of powers is also a limitation of powers, because the enumeration presupposes something not enumerated." *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 534 (2012) (alterations adopted) (quoting *Gibbons v. Ogden*, 22 U.S. (9 Wheat.) 1, 195 (1824)). The Sault's interpretation of the word "of" defies this principle, giving the Tribe limitless power to spend Fund income and then force

19

Interior to take land in trust.

### B. The Sault's Reading of MILCSA Is at Odds with Federal Laws Governing Indian Gaming.

The icing on the cake is that the Sault's position is incompatible with federal Indian gaming law. The Tribe trumpets that, under its position, any gaming-related acquisition satisfies Section 108(c)(4) and triggers Interior's mandatory trust duty because funds from gaming must be used to provide for the Tribe's "general welfare." Appellant's Br. at 12 (quoting 25 U.S.C. § 2710(b)(2)(B)). According to the Tribe, the fact that "tribal gaming operations are designed—and statutorily required—to serve the general needs of a tribe and its members, not to generate private profit" necessarily means that a tribal casino meets the requirements of Section 108(c)(4). *Id.* But the permissible uses of gaming revenue under IGRA are far broader than the purposes set forth in section 108(c)(4). *Compare* 25 U.S.C. § 2710(b)(2)(B) (permitting gaming revenue to be spent on, among other things, "tribal government operation" and "economic development), *with* MILCSA § 108(c)(4) (allowing expenditures only "for educational, social welfare, health, cultural, or charitable purposes which benefit the members" of the Tribe). For example, IGRA funds are often used to build private "hotels, conference halls, amphitheaters, and other amenities adjacent to their gaming facilities." National Indian Gaming Commission, *Use of Net Gaming Revenues Bulletin*, No. 2022-4 at 6 (June 23, 2023) (quotation marks omitted). Tribes have even used gaming revenue

to purchase and manage professional sports teams. Jeff Goodman, *A Casino Finds Its Place in the Sun*, Wash. Post (June 13, 2003) (detailing how the Mohegan Tribe uses casino revenues to run a WNBA team). None of these expenditures could credibly be thought of as devoted to "educational, social welfare, health, cultural, or charitable purposes." Again, had Congress wanted to allow such broad expenditures, it knew how—but it chose not to do so.

The gap between the permitted expenditures under MILCSA and IGRA underscores that the Sault are trying to rewrite MILCSA to create authority Congress never conferred. Congress did not authorize the Sault to spend Fund income on gaming. Nor did Congress require Interior to take in trust land the Sault acquired for gaming purposes. *See* MILCSA § 108(c) (listing permissible expenditures for Fund income). And for good reason. When tribes seek trust lands for "a school, a job training center, a health clinic, or a museum," Appellant's Br. at 27 (quotation marks omitted), the acquisition is less likely to be contentious. Purchases of land for gaming, however, are the most controversial type of trust acquisition. *See, e.g.*, S. Rep. No. 100-446, at 5 (1988), *as reprinted in* 1988 U.S.C.C.A.N. 3071, 3075 ("The regulation of gaming activities on Indian lands has been the subject of much controversy ... "); accord *Alabama v. PCI Gaming Auth.*, 801 F.3d 1278, 1300 (11th Cir. 2015). That often includes (as here) controversy among tribes. That is why Congress sensibly did not take Sault's view that the Tribe may force Interior to take

unlimited land in trust to build as many casinos as the Tribe desires, anywhere, nationwide.

Indeed, IGRA makes it all the more implausible that Congress intended for Fund interest to be spent on land for gaming. IGRA strictly limits the land on which tribes can build a casino. 25 U.S.C. § 2719(a). If Congress intended in MILCSA to grant a Michigan tribe the unilateral authority to build casinos far from its tribal lands, indeed, anywhere in the country, Congress would surely have said so explicitly. "Congress ... does not alter the fundamental details of a regulatory scheme in ... ancillary provisions." *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001).

Finally, the Sault's emphasis on gaming highlights yet another flaw in their approach: the Sault simply assume that they will be able to operate a for-profit casino on the purchased parcels. But, under IGRA, "lands acquired by the Secretary in trust for the benefit of an Indian tribe after October 17, 1988" cannot be used for gaming unless certain statutory exceptions apply. 25 U.S.C. § 2719(a). As the Sault have acknowledged, it is far from settled that the lands the Tribe plans to acquire will satisfy one of these statutory requirements. *See* Appellant's Br. at 11 (conceding that Sault do not know "when tribal gaming would commence, if ever"); *see also* Opp'n to Mot. Summ. J. at 2, 15 (D.D.C. July 29, 2019), ECF No. 56. True, they contend that the lands "might" fall under one of the required statutory exceptions. *Id.* But

"might" just underscores the uncertainty about whether the Sault will be able to generate the planned income. And without that planned income, the Sault's entire justification for forcing Interior to take the land in trust falls apart. A mandatory trust duty under MILCSA cannot reasonably arise today from the use of casino revenues that may never materialize.

### C.  The Indian Canon Has No Impact on This Court's Interpretation of MILCSA.

The Sault next contend that the Indian canon requires this Court to adopt its preferred reading of MILCSA. Appellant's Br. at 46-48. Not so. For one thing, MILCSA is unambiguous, so the Indian canon does not apply. But even if Interior's reading were "merely" the better reading of MILCSA, the Indian canon would still play no role. The Sault's interpretation would impose on Interior a sweeping obligation to take land in trust anywhere in the country. That brings to the fore the "presumption" that "the historic police powers of the States were not to be superseded by [a] Federal Act unless that was the clear and manifest purpose of Congress." *California v. FERC*, 495 U.S. 490, 497 (1990) (quotation marks omitted). In *Narragansett Indian Tribe v. National Indian Gaming Commission*, 158 F.3d 1335, 1341–42 (D.C. Cir. 1998), for instance, this Court rejected the argument that the Indian canon compelled accepting the tribe's interpretation of a statute providing that "state jurisdiction would end" in certain circumstances. Here, the unlimited power the Sault claims implicates the same concerns.

23

Moreover, if an interpretation benefits one tribe, but harms (and is opposed by) other tribes, it is impossible to construe the statute for the "benefit" of Indians. *See Rancheria v. Jewell*, 776 F.3d 706, 713 (9th Cir. 2015). On the Sault's reading, the Tribe could acquire and force Interior to take in trust *all* the land in another tribe's historic territory—that is scarcely a pro-tribal position. The Indian canon is thus inapplicable.[5]

## II.    Interior's Interpretation Warrants Deference.

For the reasons above, the plain text of the statute forecloses the Sault's arguments. But if more were needed, Interior certainly acted *reasonably* in rejecting the Sault's boundless interpretation of Section 108(c)(4). *See* AR972 (Jan. 19, 2017 Letter from Ann Marie Bedsloe Downes, Dep't of Interior, explaining that Fund income cannot be used "to start an economic enterprise, which may generate its own profits, which profits might then be spent on social welfare purposes"). Interior's interpretation is therefore entitled to deference.

The Sault maintain that the Indian canon "trumps ... [this] normally-applicable deference." Appellant's Br. at 46 (alteration and quotation marks omitted). As noted, *see supra* I.C, the Indian canon has no role here. But even if the canon were in play,

---

[5] In response, the Sault point to *City of Roseville v. Norton*, 348 F.3d 1020 (D.C. Cir. 2003). Appellant's Br. at 48 n.7. But *Norton* did not deal with conflicting interests between various tribes, *see id.* at 1022, and thus provides no guidance here.

24

"deference does not disappear from the process of reviewing an agency's interpretation of those statutes it is trusted to administer for the benefit of the Indians, although that deference applies with muted effect." *Cobell v. Salazar*, 573 F.3d 808, 812 (D.C. Cir. 2009). In Indian law cases, courts must still "determine if the agency's interpretation is permissible, and if so, defer," while simply remaining "mindful" of the Indian canon. *Confederated Tribes of Grand Ronde Cmty. of Or. v. Jewell*, 830 F.3d 552, 558 (D.C. Cir. 2016). The deference due to Interior, in carrying out its duty as the Tribe's trustee, underscores why Interior acted permissibly in rejecting the Sault's interpretation.

Indeed, as this Court has previously held, Interior has an "obligation to ensure a lawful trusteeship" under MILCSA, and it must therefore "have the authority to verify that the land was legitimately acquired ... for the limited uses detailed in Section 108(c)." *Sault Ste. Marie*, 25 F.4th at 18-19. Although this Court concluded that it did not need to resolve how to reconcile *Chevron U.S.A. Inc. v. NRDC, Inc.*, 467 U.S. 837 (1984), and the Indian canon, *see id.* at 21 n.7, its analysis underscores that Congress gave Interior "broad power to carry out the federal government's unique responsibilities with respect to" the Sault, to which courts properly defer. *Cal. Valley Miwok Tribe v. United States*, 515 F.3d 1262, 1267 (D.C. Cir. 2008). Interior has both a duty and an expertise in identifying what interpretation benefits an Indian tribe. Today's Sault leaders may prefer an

interpretation that lets them try their hand at a casino in, say, Virginia. Congress and Interior, however, could reasonably conclude that promoting such adventurism is not in the best interests of the Sault. After all, Congress could have allowed the Sault leadership to spend Fund interest on anything it wished. But Congress chose otherwise. It is not novel to suggest that beneficiaries gain from enforceable limits on a trustee's discretion.

In *Cobell v. Salazar*, 573 F.3d at 812, this Court explained that "where Congress has entrusted to [Interior] the duty of applying, and therefore interpreting, a statutory duty …, we cannot ignore the responsibility of the agency for careful stewardship of limited government resources." Likewise, *California Valley Miwok Tribe v. United States* reiterated that when "the Secretary's interpretation actually advances 'the trust relationship between the United States and the Native American people,'" the Court's "adherence to *Chevron* is consistent with the customary Indian-law canon." 515 F.3d at 1266 n.7. Here, too, Interior reasonably concluded that its interpretation advanced its trust responsibility to the Sault and was in the best interests of the Tribe. *Accord Shakopee Mdewakanton Sioux Cmty. v. Hope*, 16 F.3d 261, 264-65 n.6 (8th Cir. 1994) (because "the Commission has considered the welfare of Indian Tribes in applying the statute," it "satisfied the

requirement that statutes be interpreted 'in favor of the Indian Tribes' even though the Tribes contest the agency determination").[6]

## CONCLUSION

For the foregoing reasons, as well as those presented in the briefs of the Department of the Interior and of the Intervenor Tribes, this Court should affirm the ruling of the district court.

Respectfully Submitted,

DATED: January 10, 2024

/s/ Ian Heath Gershengorn
Ian Heath Gershengorn
*Counsel of Record*
Mary E. Marshall
JENNER & BLOCK LLP
1099 New York Avenue, NW
Suite 900
Washington, DC 20001-4412
Phone: (202) 639-6000
Fax: (202) 639-6066
igershengorn@jenner.com

*Counsel for Intervenor-Appellees*
*MGM Grand Detroit, L.L.C.,*
*Detroit Entertainment, L.L.C.,*
*and Greektown Casino, L.L.C.*

---

[6] The Casinos preserve for further review the argument that the Indian canon (or other policy-based canons) never trumps *Chevron*, an issue on which the Circuits are split. *Compare Rancheria,* 776 F.3d at 713 *and Penobscot Indian Nation v. Key Bank of Maine*, 112 F.3d 538, 550 (1st Cir. 1997) (both holding that *Chevron* governs), *with S. Ute Indian Tribe v. Sebelius*, 657 F.3d 1071, 1078 (10th Cir. 2011) (holding Indian canon governs).

## <u>CERTIFICATE OF COMPLIANCE</u>

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 6645 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f) and Circuit Rule 32(e)(1).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the typestyle requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 365, Times New Roman 14-point.

Dated: January 10, 2024

*/s/*    Ian Heath Gershengorn
Ian Heath Gershengorn

## **CERTIFICATE OF SERVICE**

I hereby certify that on January 10, 2024, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the D.C. Circuit by using the CM/ECF system. I certify that Defendants-Appellees are registered CM/ECF users and that service to Defendants-Appellees will be accomplished by the CM/ECF system.


*/s/*    Ian Heath Gershengorn
Ian Heath Gershengorn

**ADDENDUM**

# INDEX

25 U.S.C. § 2710(b)(2)(B) ................................................................... Add-1

25 U.S.C. § 2719(a) .......................................................................... Add-1

**25 U.S.C. § 2710**

§ 2710. Tribal gaming ordinances

****

(b) Regulation of class II gaming activity; net revenue allocation; audits; contracts

****

(2) The Chairman shall approve any tribal ordinance or resolution concerning the conduct, or regulation of class II gaming on the Indian lands within the tribe's jurisdiction if such ordinance or resolution provides that--

(A) except as provided in paragraph (4), the Indian tribe will have the sole proprietary interest and responsibility for the conduct of any gaming activity;

(B) net revenues from any tribal gaming are not to be used for purposes other than--

(i) to fund tribal government operations or programs;

(ii) to provide for the general welfare of the Indian tribe and its members;

(iii) to promote tribal economic development;

(iv) to donate to charitable organizations; or

(v) to help fund operations of local government agencies;

****

**25 U.S.C. § 2719**

§ 2719. Gaming on lands acquired after October 17, 1988

(a) Prohibition on lands acquired in trust by Secretary

Except as provided in subsection (b), gaming regulated by this chapter shall not be conducted on lands acquired by the Secretary in trust for the benefit of an Indian tribe after October 17, 1988, unless--

Add-1

(1) such lands are located within or contiguous to the boundaries of the reservation of the Indian tribe on October 17, 1988; or

(2) the Indian tribe has no reservation on October 17, 1988, and--

    (A) such lands are located in Oklahoma and--

        (i) are within the boundaries of the Indian tribe's former reservation, as defined by the Secretary, or

        (ii) are contiguous to other land held in trust or restricted status by the United States for the Indian tribe in Oklahoma; or

    (B) such lands are located in a State other than Oklahoma and are within the Indian tribe's last recognized reservation within the State or States within which such Indian tribe is presently located.

****